IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| OSPREY BAY BUILDING & <br> DEVELOPMENT, LLC <br> 1114 Benfield Blvd. <br> Suite J <br> Millersville, MD 21108 <br> (Anne Arundel County) <br><br> Plaintiff, <br><br> vs. <br><br> IKEA NORTH AMERICA SERVICES, LLC <br> 420 Alan Wood Road <br> Conshohocken, PA 19428 <br><br> And <br><br> IKEA INDIRECT MATERIAL & <br> SERVICES, LLC <br> 420 Alan Wood Road <br> Conshohocken, PA 19428 <br><br> Defendants. | Civil Action No. |

## COMPLAINT
### (Breach of Contract; Tortious Interference)

COMES NOW the Plaintiff, Osprey Bay Building & Development LLC ("Osprey"), by counsel, and moves this Honorable Court for judgment against Defendants IKEA North America Services, LLC and IKEA Indirect Material & Services, LLC (hereinafter collectively referred to as "IKEA") on the grounds and in the amounts as set forth below.

## The Parties

1. Plaintiff, Osprey, is a Maryland limited liability company. Osprey was a licensed contractor whose primary business was the installation of residential kitchens and bathrooms. Osprey's two members are Lee Rose ("Rose") and Michael Rolnick ("Rolnick") Rose lives at 7010 Channel Village Ct., Annapolis, MD 21403, and is a citizen of Illinois. Rolnick lives at 979 Breakwater Drive, Annapolis, MD 21403, and is a citizen of Maryland.

2. Defendant, IKEA North America Services, LLC, is a foreign limited liability company organized under Delaware law whose principal place of business is in Pennsylvania. It owns and operates retail furniture stores throughout the United States. Its executives helped design the Request for Proposal and then directly oversaw the implementation and operation of the agreement described below. It is owned by IKEA Pennsylvania, LLC, a Delaware limited liability company whose principal place of business is in Pennsylvania.

3. Defendant, IKEA Indirect Material & Services, LLC, is a foreign limited liability company organized under Delaware law whose principal place of business is in Pennsylvania. It is owned by and is the purchasing arm of IKEA North America Services, LLC.

## Jurisdiction and Venue

4. Jurisdiction of this matter is founded upon 28 U.S.C. § 1332(a)(1). The parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Venue is proper under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

**Factual Allegations**

5.  Osprey is in the business of kitchen and bath installations. Osprey commenced work installing kitchens for customers at IKEA's College Park, Maryland location – which is located in this District – in March 2009.

6.  Osprey provided excellent service, first to the IKEA College Park location, and later to IKEA's White Marsh, MD, and Potomac Mills, VA facilities.

7.  In early 2011, IKEA asked Osprey to participate in responding to an IKEA Request for Proposal to select preferred providers of kitchen installation and related services for IKEA's United States retail stores.

8.  IKEA began the bidding process with the issuance of a Request for Proposal sent in July 2011 to approximately 60 contractors who had been providing kitchen installation services to IKEA's locations throughout the United States.

9.  Osprey, along with other bidders, advanced to a second round and responded to a Request for Quotations in August 2011.

10. In or about October 2011, IKEA selected Osprey as the "preferred service provider" for the East Coast region and the parties began to negotiate an agreement. IKEA initially planned to enter what would be a Preferred Provider Agreement ("Agreement") by Thanksgiving 2011 and then roll out the East Coast Regional program, covering 17 stores from Massachusetts to Florida, in two phases: the first would begin about March 3, 2012 (Phase I) and the second would begin about July 1, 2012 (Phase II). Under the original schedule, Osprey would have had no less than three months to build the infrastructure necessary to service the Agreement at each of the 17 stores that IKEA proposed awarding to Osprey. Due to various IKEA delays and demands of IKEA bureaucracy in internally obtaining corporate approvals implementing the Program, the Agreement was not executed until February 5, 2012. Despite its delays in finalizing the Agreement, IKEA was unwilling to move the launch dates.

11. Initially, IKEA took the position that the Agreement should be terminable at will. Because Osprey's performance would require an infusion by Osprey of approximately $3 million in capital, Osprey would not agree to that and insisted that the

Agreement allow a notice and cure period.  Ultimately the parties agreed to a 42-month contract term with a termination provision, as follows:

> This Agreement may be terminated earlier than specified should the Contractor [Osprey] be unable to honor its contractual obligations or properly remedy any performance issues within thirty (30) days of report of such performance issues.  Proper remedy of performance is solely determined by Buyer [IKEA].

12. Based on this provision and the remainder of the Agreement, Osprey invested approximately $3 million in working capital in order to perform the Agreement. This investment was necessary because Osprey went from servicing three IKEA stores (College Park and White Marsh, MD and Woodbridge, VA) to fourteen other locations covering the East Coast, ranging from Massachusetts, Connecticut, Pennsylvania, New York, New Jersey, North Carolina, Georgia, and Florida. This expansion required, *inter alia*, the hiring and training of substantial new staff as Osprey increased its staff nearly five-fold; purchasing and leasing a fleet of service vehicles and tracking equipment for each market; purchasing up-to-date computer equipment, telephone equipment, and software, and so forth.

13. From about February 5, 2012 until August 30, 2012, Osprey fully performed its obligations under the Agreement.  At no time during this period did IKEA take the position that Osprey was unable to honor its contractual obligations. Nor did IKEA advise Osprey that there were performance issues that had to be remedied within the next thirty days.

14. On August 31, 2012, Lee Rose, Osprey's Managing Member, was summoned to a meeting with IKEA.  At that meeting, Rose was given a letter whereby IKEA purported to terminate the Agreement because of Osprey's purported "failure to meet" (not "unable to honor" as the Agreement's language required for termination made without notice and an opportunity to cure) Osprey's contractual obligations. Rose had no prior intimation of IKEA's intent to terminate the Agreement.

15. The following purported specifications were given in that letter:
   a. Late invoices;
   b. Inaccurate invoices;

      c. Osprey co-workers and contractors were not being subject to Lexis/Nexis background check and screening; and

      d. No updates were being made by Osprey in "I-sell" (IKEA's customer status tracking program).

16. These performance issues – which were not previously identified by IKEA to Osprey with a requisite 30-day cure period – were either baseless or readily curable and did not reasonably go to the heart of the bargain from IKEA's standpoint. In fact, these issues were a pretext made to terminate Osprey for reasons having nothing to do with Osprey's performance.

17. Following the August 31, 2012 termination, IKEA held out to Osprey the possibility that IKEA might be willing to consider continuing to do business with Osprey under different conditions, including a much smaller scaled project. Those conditions included paying refunds to certain customers, and performing three store kitchen display re-modeling projects for IKEA.

18. These representations by IKEA were not made in good faith, but were intended to mollify Osprey so that Osprey would do nothing to frustrate IKEA from its intention to transition to another provider.

19. IKEA employees almost immediately followed this termination up with calls to existing Osprey customers, informing them that Osprey had been terminated. The calls from the IKEA staff damaged Osprey's reputation and caused them to lose former and future business. This cost Osprey upwards of $1 million in cancellations of existing contracts. Furthermore, when contacting customers, the IKEA employees also recommended that customers call their banks and request credit card charge-backs for the cost of products and services charged by Osprey, which many customers then did.

20. IKEA awarded a contract to Traemand Partnership Ltd. d/b/a Traemand Installation Services ("Traemand") to handle the Osprey locations. IKEA thereafter informed Osprey that IKEA would not resume doing business with Osprey even on a modified basis.

21. IKEA's August 31, 2012 termination of the Agreement was baseless, pretextual and in bad faith, and constituted willful misconduct and/or gross negligence, because the decision was characterized by conscious indifference to the probable harm to Osprey, which was reasonably apparent.

22. IKEA's willful misconduct and/or gross negligence deprived Osprey of its right to earn profits under the Agreement.

23. IKEA's willful misconduct and/or gross negligence destroyed Osprey's business.

### Count I (Breach of Contract)

24. Plaintiff realleges paragraphs 1-23.

25. IKEA and Osprey had an Agreement which had a term of 42 months and could only be terminated by IKEA under certain specified conditions.

26. IKEA's purported termination of the Agreement on August 31, 2012 was a breach of the Agreement.

27. IKEA's purported termination of the Agreement on August 31, 2012 was in bad faith and constituted willful misconduct and/or gross negligence, as a direct and proximate result of which Osprey was injured.

### Count II (Breach of Covenant of Good Faith and Fair Dealing)

28. Plaintiff realleges paragraphs 1-27.

29. The Agreement by its terms was governed by Delaware law.

30. Under Delaware law, every contract contains an implied covenant of good faith and fair dealing.

31. The implied covenant requires contacting parties to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.  IKEA violated that covenant by the acts and practices set forth above, as a direct and proximate result of which Osprey was injured.

**Count III (Tortious Interference with Contract and Business Relations)**

32. Plaintiff realleges paragraphs 1-31.

33. The calls made by IKEA's agents to Osprey customers informing them that the contract between IKEA and Osprey had been terminated (when in fact it had been breached by IKEA) and recommending that those customers call their banks and request charge-backs, as stated in paragraph 19, *supra*, constituted a wrongful interference with Osprey's contracts with customers and business relations. As a direct and proximate result of IKEA's communications to Osprey's customers, many of those customers then breached their agreements with Osprey, for which Osprey suffered financial injury.

**Count IV (Breach of Contracts; Unjust Enrichment)**

34. Plaintiff realleges paragraphs 1-33.

35. At the time IKEA purported to terminate the Agreement, IKEA had collected funds from customers based on Osprey's invoices, based on work Osprey had done.

36. IKEA refused and continues to refuse to remit those funds to Osprey.

WHEREFORE, for the foregoing reasons, Plaintiff Osprey demands judgement as follows:

A. Reliance damages for the loss of capital infused by Osprey to service the Agreement, in excess of $3 million.

B. Expectancy damages for Osprey's lost profits on the Agreement breached by IKEA's willful misconduct and/or gross negligence, in an amount to be determined at trial.

C. The value of Osprey's business destroyed by IKEA's willful misconduct and/or gross negligence in an amount to be determined at trial.

D. The value of Osprey's lost business caused by IKEA's tortious interference in an amount to be determined at trial.

E. Damages for funds paid to IKEA that IKEA was obligated to remit to Osprey in an amount to be determined at trial.

F. Punitive damages for IKEA's willful misconduct and/or gross negligence.

G. The costs of this action including attorney's fees.

H. Such further relief as is just and equitable.

**Jury Demand**

Plaintiff demands trial by jury as to all issues so triable.

                                          Respectfully submitted,

| /s/ L. Barrett Boss | /s/ Stephen C. Leckar |
|---|---|
| L. Barrett Boss | Robert A.W. Boraks |
| Md. Fed. Bar # 04404 | Md. Fed. Bar # 13641 |
| Chad E. Kurtz | Stephen C. Leckar |
| (Application Pending) | Md. Fed. Bar # 0823 |
| Cozen O'Connor P.C. | Kalbian Hagerty LLP |
| Army-Navy Building, Suite 1100 | 888 17th St., NW, 10th Floor |
| 1627 I St., NW | Washington, D.C. 20006 |
| Washington, D.C. 20006 | (202) 223-5611 |
| (202) 912-4800 | (Fax) 223-0025 |
| (Fax) (202) 640-5939 | rboraks@kalbianhagerty.com |
| bboss@cozen.com | sleckar@kalbianhagerty.com |
| ckurtz@cozen.com | |